# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                      Case No. 18-cr-250 (ECT/SER)

          Plaintiff,

v.                                             **REPORT AND**
                                               **RECOMMENDATION**

Justin Thomas Chapman,

          Defendant.

Alexander D. Chiquoine and Manda M. Sertich, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for the Government); and

Manvir K. Atwal, Assistant Federal Defender, Federal Defender's Office, 300 South Fourth Street, Suite 107, Minneapolis MN 55415 (for Defendant).

This matter is before the Court on Defendant's Motion to Suppress Statements, Admissions and Answers, (ECF No. 33), and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, (ECF No. 34). These motions have been referred to the undersigned for a report and recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on January 3, 2019. (ECF No. 45). For Defendant's challenge to two search warrants, the Court received into evidence: an August 2, 2018 search warrant for a residence, truck, and email account, Case No. 18-mj-679-HB, (Gov't Ex. A); and a September 28, 2018 search warrant for a residence in Brooklyn Center, Minnesota, Case No. 18-mj-817-BRT, (Gov't Ex. B). No testimony or further argument

was presented on this motion and it was submitted on the briefing. (ECF Nos. 34, 35). With respect to Defendant's motion to suppress statements, the Court received into evidence: photographs taken during an August 10, 2018 search, (Gov't Exs. 1–7); an audio recording of Defendant's questioning by law enforcement, (Gov't Ex. 8); and a completed FD-1086 Form from the FBI, (Gov't Ex. 9). The Court heard testimony from one witness, FBI Special Agent Robert Blackmore. (January 3, 2019 Motion Hearing Tr. 8:1–49:19, ECF No. 44).

Post-hearing briefing is complete, (ECF Nos. 47, 48), and these motions are ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, the undersigned recommends that Defendant's motions be denied.

## I.    MOTION TO SUPPRESS

### A. Findings of Fact

#### 1.        The Investigation

In June 2017, the website chatango contacted the FBI in San Francisco, reporting that users were opening chat rooms where they shared images and videos of child pornography or links thereto. (Tr. 8:20–9:4, 35:14–18). Investigation showed the moderator of one of the suspected chat rooms was a user called "kummer22." (Tr. 9:6–20). Responding to administrative subpoenas, chatango provided the IP address for "kummer22," which ultimately traced back to a residence in Brooklyn Center, Minnesota. (Tr. 9:6–20). The FBI learned that Defendant Justin Thomas Chapman and his parents lived at the Brooklyn Center home. (Tr. 9:21–10:1). On August 2, 2018, law enforcement obtained a warrant to search the Brooklyn Center home. (Tr. 10:2–8; Gov't Ex. A).

## 2.    The Entry and Search of Chapman's Residence

At 7:28 a.m. on August 10, 2018, law enforcement executed the search warrant. (Tr. 10:9–12). The law enforcement team comprised of eight FBI agents, a uniformed Brooklyn Center Police Department sergeant,[1] and four or five FBI administrative personnel. (Tr. 12:21–14:14, 36:20–37:3, 37:23–38:2). SA Blackmore was wearing body armor underneath a shirt, with a vest over top that had law enforcement markings. (Tr. 19:19–20:4). The accompanying sworn agents were similarly dressed in bulletproof vests with law enforcement markings and badges. (Tr. 37:4–22).

Law enforcement approached the front entrance of the Chapman residence and opened the screen door. (Tr. 11:1–16; *see* Gov't Ex. 1). Law enforcement then knocked on the front door "several times for approximately two to three minutes," announcing their presence. (Tr. 11:1–16). There was no answer. (Tr. 11:1–16). SA Blackmore ordered the front door breached. (Tr. 11:1–16). A law enforcement member used a ram to hit the front door. (Tr. 11:1–16, 36:4–15). One of the door panels gave way, revealing a person's arm holding the door shut. (Tr. 11:1–16). Law enforcement continued to announce their presence. (Tr. 11:1–16). The person inside "backed off" and law enforcement gained entry into the home. (Tr. 11:1–16).

Once inside, law enforcement encountered Chapman's mother. (Tr. 11:17–12:4, 36:4–15). SA Blackmore asked her if Chapman was present. (Tr. 11:17–12:4, 36:4–15). She indicated Chapman was downstairs in his bedroom. (Tr. 11:17–12:4). Law

---

[1] This officer was replaced by a Brooklyn Center Police Department detective at some point following the initial entry into the residence.

enforcement conducted a security sweep of the residence, with SA Blackmore and several other officers going downstairs for Chapman. (Tr. 11:17–12:4; *see* Gov't Ex. 2). Once downstairs, law enforcement called for Chapman to exit his room. (Tr. 11:17–12:4, 15:11–16; *see* Gov't Ex. 3). Law enforcement directed Chapman to exit his bedroom, walk backwards towards them, and put his hands behind his back. (Tr. 39:20–40:15). Chapman complied and was handcuffed. (Tr. 11:17–12:4, 15:17–16:2, 39:20–40:15).

During the time approaching the residence through completing the security sweep, law enforcement's weapons were drawn. (Tr. 12:5–20, 37:8–9, 39:14–19). While Chapman was called out of his bedroom, law enforcement pointed their weapons at him. (Tr. 12:5–20, 39:14–19). The FBI administrative personnel, unlike the FBI agents and Brooklyn Center police, were unarmed. (Tr. 13:10–17). Once the security sweep was completed, law enforcement holstered their weapons. (Tr. 14:16–21).

### 3.    The Interview of Chapman

Before the interview began, SA Blackmore told Chapman he was not under arrest, that law enforcement wanted to speak with him, and that "as soon as the premises was secure, the handcuffs would come off." (Tr. 17:23–18:2). Chapman appeared nervous, but stated that he understood. (Tr. 18:3–5). This unrecorded portion of the conversation lasted "a couple of minutes." (Tr. 18:6–8). Chapman's handcuffs were removed. (Tr. 19:13–15).

SA Blackmore, accompanied by FBI Special Agent Amanda Knez, conducted a recorded interview of Chapman. (Tr. 17:4–22, 18:9–17; Gov't Ex. 8). The interview occurred in the basement. (Tr. 18:18–23; Gov't Exs. 4–7). Chapman was on a dark-

colored couch next to its left-side armrest, SA Blackmore was to Chapman's left in a brown chair, and SA Knez was in a rolling office chair across from Chapman. (Tr. 18:24–19:9, 41:18–22; Gov't Exs. 4–6). SA Blackmore and SA Knez were seated such that they did not block Chapman's access to the stairway leading upstairs from the basement. (Tr. 19:10–12; *see* Gov't Exs. 4–7). SA Blackmore was wearing body armor underneath a shirt, having removed his vest with law enforcement markings. (Tr. 19:19–20:4, 41:23–42:10). SA Blackmore untucked his shirt to conceal his weapon. (Tr. 19:19–20:13).

As soon as SA Blackmore turned on the audio recorder, Chapman asked to grab a drink out of a nearby refrigerator. (Gov't Ex. 8, at 00:06–00:24).[2] There is no audible response to Chapman's request, but the audio recording contains sounds of footsteps followed by a door closing, then SA Blackmore says "there you go" with Chapman responding "thank you" and a can being opened. (Gov't Ex. 8, at 00:06–00:24). SA Blackmore testified Chapman was not permitted to retrieve the drink himself and someone else grabbed it for him. (Tr. 45:7–46:2; *see* Tr. 22:3–6, 34:14–16, 45:7–46:2).

SA Blackmore identified himself and showed his FBI identification. (Gov't Ex. 8, at 00:24–00:32). SA Blackmore stated law enforcement had a search warrant and, "like [he] said a few minutes ago," Chapman was not under arrest and the handcuffs were for safety purposes. (Gov't Ex. 8, at 00:28–00:45). Chapman stated he understood. (Gov't Ex. 8, at 00:28–00:45). SA Blackmore stated he had no intention to arrest Chapman or anyone in the residence. (Gov't Ex. 8, at 00:45–00:57).

---

[2] Citations are to the time stamp of "008.WMA" on Gov't Ex. 8. The other audio files located on Gov't Ex. 8 are excerpts from the overall recording.

SA Blackmore told Chapman he would like to ask some questions but he did not have to answer if he did not want to, and it was "completely up to [him]." (Gov't Ex. 8, at 00:57–01:07; Tr. 20:14–21:7, 33:4–34:24). Chapman responded that he did not "know what this is about." (Gov't Ex. 8, at 00:57–01:07). SA Blackmore repeated that Chapman was free to leave, noting law enforcement had a search warrant for the house, a truck, and Chapman's person. (Gov't Ex. 8, at 01:07–01:35; Tr. 20:14–21:7, 33:4–34:24). Chapman again suggested he did not understand what was going on, with SA Blackmore saying "we'll get in to everything." (Gov't Ex. 8, at 01:23–01:33). SA Blackmore again stated that law enforcement would like to ask Chapman questions, but that Chapman did not have to talk. (Gov't Ex. 8, at 01:33–01:35; Tr. 20:14–21:7, 33:4–34:24).

SA Blackmore asked Chapman if he was willing to answer some questions, indicating Chapman could pick and choose the questions he answered. (Gov't Ex. 8, at 01:35–01:45; Tr. 20:14–21:7, 33:4–34:24). Chapman responded that "it depends on the questions," which was "fine" with SA Blackmore. (Gov't Ex. 8, at 01:35–01:45; Tr. 20:14–21:7, 33:4–34:24). After going through some biographical information, SA Blackmore told Chapman "what we're here for has to do with computers." (Gov't Ex. 8, at 02:20–02:32). SA Blackmore asked Chapman to describe who used which computers or internet devices in the home. (Gov't Ex. 8, at 02:20–02:32). Chapman responded: "I don't want to say right now." (Gov't Ex. 8, at 02:20–02:32; Tr. 22:7–13). SA Blackmore asked Chapman what email addresses he uses, with Chapman saying he had many, then asking "what this is about" before answering. (Gov't Ex. 8, at 02:32–02:45; *see* Tr. 22:7–

13). SA Blackmore handed Chapman a copy of the warrant. (Gov't Ex. 8, at 02:45–03:30).

Immediately afterwards, SA Blackmore is heard commanding Chapman: "Don't stand up without telling us first!" (Gov't Ex. 8, at 02:50–02:55; Tr. 23:9–24:10, 44:4–10). Chapman apologizes, saying he "didn't realize." (Gov't Ex. 8, at 02:50–02:55). SA Blackmore informed Chapman that law enforcement was present because "someone in here has been moderating chatrooms where people trade child pornography." (Gov't Ex. 8, at 03:00–03:10). SA Blackmore told Chapman he is the suspected moderator. (Gov't Ex. 8, at 04:10–05:30). SA Blackmore said law enforcement's goal is to find the children depicted in child pornography and he would like some cooperation, truth, and help from Chapman in order to maybe find the children. (Gov't Ex. 8, at 05:45–06:10). Chapman asked "what do I get in return?" (Gov't Ex. 8, at 06:09–06:11). SA Blackmore responded:

> I'm not in a position, I'm not allowed to make deals. I'm just telling you straight up: I can't make deals. What I can tell you is the more cooperation and the more truthful you are with us, all that gets made known to the prosecutor at the end of the day. And that goes into deciding whether charges are filed, or not. And if they are filed, maybe it's not as serious a charge that gets filed, or it gets taken into consideration, you know, if there is some kind of a plea deal, maybe it's a lesser sentence. But there's no guarantee. That's a long ways down the road.

(Gov't Ex. 8, at 06:11–06:47; Tr. 25:14–26:15). Chapman responded that he can "help get a lot of people if I get some help in return, with no jail time or something like that." (Gov't Ex. 8, at 06:47–06:54). SA Blackmore said he cannot "make those kind of promises." (Gov't Ex. 8, at 06:54–06:57). Chapman said he understood but was saying it

for the recorder. (Gov't Ex. 8, at 06:57–07:02). SA Blackmore affirmed that Chapman's request was now on the record. (Gov't Ex. 8, at 07:01–07:07).

Chapman immediately discussed his use of chatango. (Gov't Ex. 8, at 07:07–07:55). SA Blackmore asked Chapman about video and image links he shared on chatango, with Chapman refusing to answer. (Gov't Ex. 8, at 07:40–07:55). SA Blackmore and Chapman discussed Chapman's online activities and related matters for the better part of an hour. (Gov't Ex. 8, at 07:55–1:01:10).

SA Blackmore asked for Chapman's consent to take over his screen names. (Gov't Ex. 8, at 23:00–23:18, 29:30–36:28; Tr. 27:23–28:25, 43:16–24; *see* Gov't Ex. 9). The FBI uses a Consent to Assume Online Identity form when it wishes to assume a subject's online usernames to pose as them online. (Tr. 27:23–28:25, 43:16–24; Gov't Ex. 9). Chapman indicated he talks to a woman with his screenname and would like to continue talking to her. (Gov't Ex. 8, at 23:18–23:31, 29:45–31:58; Tr. 27:23–28:25). Chapman refused to tell SA Blackmore the woman's identity. (Gov't Ex. 8, at 30:34–31:58). SA Blackmore said: "You give us that cooperation, it gets made known to the prosecutor, and it will help." (Gov't Ex. 8, at 29:49–29:54). SA Blackmore told Chapman that the consent to take over his online identities was voluntary, but if he chose not to do it he "would be making a serious mistake if [he] got into those chatrooms and [he] talk[ed] about what's going on today. That could be considered obstruction of justice." (Gov't Ex. 8, at 30:48–31:17). After SA Blackmore explained the need to promptly obtain Chapman's online identities, Chapman said he understood and continued: "I just want a little help in return, too. I know you said what you said, and I understand, but I need—just trying to avoid

anything—jail—if I could. Understand what I'm saying?" (Gov't Ex. 8, at 33:53–34:13).

SA Blackmore responded that he cannot guarantee or promise anything, adding that the only promise he could give Chapman was that any help he provided would be made known to the prosecutor. But SA Blackmore emphasized it is ultimately up to the prosecutor. (Gov't Ex. 8, at 34:13–34:40). Chapman also indicated he was hesitant because he did not know how much it would help him. (Gov't Ex. 8, at 35:20–35:33, 42:45–43:10). SA Blackmore said, "yes it's helpful" if law enforcement recovers a child via someone's online identities, but noted it was different from someone putting their life at risk to help law enforcement. (Gov't Ex. 8, at 35:33–36:13).

After discussing other matters, SA Blackmore told Chapman he needed to think long and hard about letting law enforcement use his online identities and, in response to Chapman's question, stated he had no more than a day or two to decide because the online identities lose value to law enforcement. (Gov't Ex. 8, at 42:25–42:45). After describing how some people get credit if SA Blackmore can "make a case" out of using someone's online identities, he said: "And again, I've said it probably half a dozen times already. I don't make promises. I can't make deals. Only the prosecutors can do that and we're not even at a point yet where I know if charges are gonna be filed." (Gov't Ex. 8, at 43:08–44:00). Chapman reiterated that he wants to avoid jail time if he can. (Gov't Ex. 8, at 44:00–44:25). SA Blackmore reminded Chapman he was not under arrest. (Gov't Ex. 8, at 44:25–44:45). Chapman asked to read the form before consenting; SA Blackmore obliged. (Gov't Ex. 8, 46:26–46:45). Chapman signed the form. (Gov't Ex. 8, 46:45–56:05; Tr. 27:23–28:25; Gov't Ex. 9). Under the signature, Chapman misspelled his last

name as "Chapan." (Gov't Ex. 9). SA Blackmore and SA Knez each signed the form at 8:35 a.m. (Gov't Ex. 9).

At various points during the interview, Chapman indicated he needed to move around or grab something. SA Blackmore testified that Chapman was permitted to move around the basement provided he had an escort. (Tr. 24:11–19, 34:9–13, 44:11–45:6, 48:9–11). From the recording, there are several examples. Chapman indicated he needed to "stand up for a second." (Gov't Ex. 8, at 32:32). SA Blackmore replied "ok" and the two stood. (Gov't Ex. 8, at 32:32–32:41). Chapman indicated he was sitting back down about four minutes later. (Gov't Ex. 8, at 36:28). An alarm on Chapman's tablet device was going off in the background, so Chapman asked SA Blackmore to come with him to shut it off, with SA Blackmore telling him not to worry about it. (Gov't Ex. 8, at 37:30–37:40). Chapman asked to get up and get another drink out of the refrigerator, with SA Blackmore indicating SA Knez would get it for him. (Gov't Ex. 8, at 48:00–48:18). Chapman indicated he was standing up. (Gov't Ex. 56:16). Chapman asked to go to the laundry room to grab a pair of socks, with SA Blackmore telling Chapman to hold on because he would go with him. (Gov't Ex. 8, at 1:01:52–1:02:12; Tr. 24:11–19, 44:11–45:6). The pair went to get socks. (Gov't Ex. 8, at 1:02:12–1:02:56; Tr. 24:11–19, 44:11–45:6).

While Chapman was being interviewed, law enforcement conducted a search of the home. (Tr. 42:13–18, 47:8–46:8, 48:22–49:12). There are several instances where the recording picks up other law enforcement officers moving around the house. (*E.g.*, Gov't Ex. 8, at 15:45–15:54 (Chapman referencing someone coming down the stairs)). Indeed,

the interview is interrupted early on by another law enforcement officer asking SA Blackmore if they were "taking everything from upstairs." (Gov't Ex. 8, at 16:37–16:50).

### 4.    Chapman's Well-Being

SA Blackmore testified that child pornography suspects are statistically more likely to attempt to hurt themselves or commit suicide, so he generally asks suspects about their well-being. (Tr. 29:21–30:8). Law enforcement found a .22 rifle and a pocket knife while searching Chapman's residence. (Gov't Ex. 8, at 1:02:59–1:03:10; Tr. 30:12–15). SA Blackmore told Chapman "it is obvious" he was nervous and scared, so he wanted to make sure he was ok before law enforcement left. (Gov't Ex. 8, at 1:03:10–1:03:25; Tr. 29:21–30:11, 46:11–23). Chapman responded: "I don't know to be honest with you." (Gov't Ex. 8, at 1:03:25–1:03:28). SA Blackmore asked Chapman whether he thought about hurting himself, Chapman replied that he did not know how to answer that truthfully. (Gov't Ex. 8, at 1:03:28–1:03:36; Tr. 29:21–30:8). SA Blackmore replied that he could get an ambulance, with Chapman asserting he did not need one. (Gov't Ex. 8, at 1:03:37–1:03:41). Nonetheless, Chapman affirmed that self-harm was in his thoughts. (Gov't Ex. 8, at 1:03:42–1:03:52). Chapman refused consent for law enforcement to take his rifle. (Gov't Ex. 8, at 1:03:53–1:04:02; Tr. 30:16–19).

Chapman talked about how his life was over because of how people in jail treat people like him. (Gov't Ex. 8, at 1:04:05–1:04:36). SA Blackmore reiterated that, if jail happens, it was a "good distance" in the future. (Gov't Ex. 8, at 1:04:24–1:04:30). Chapman responded that he suspected he will go to jail unless he "gets a lot of help" for assisting law enforcement and he cannot afford a lawyer. (Gov't Ex. 8, at 1:04:43–

1:04:51). SA Blackmore told Chapman if wanted to talk to a lawyer, he can contact the federal defender's office if he needs some "advice down the road." (Gov't Ex. 8, at 1:04:51–1:05:09). Chapman stated he did not know "if I'm gonna be there." (Gov't Ex. 8, at 1:05:09–1:05:11). SA Blackmore said the last thing he wanted to see happen is for Chapman to hurt himself or anyone else. (Gov't Ex. 8, at 1:05:15–1:05:19). Chapman said he "won't hurt anyone else." (Gov't Ex. 8, at 1:05:19–1:05:21; Tr. 31:2–19). Chapman relayed that he was "that close to doing it" three months prior but was stopped by a friend. (Gov't Ex. 8, at 1:05:40–1:05:51; Tr. 31:20–24). SA Blackmore said that he had serious concerns about Chapman's well-being. (Gov't Ex. 8, at 1:05:52–1:06:00).

SA Blackmore gave Chapman two options: (1) call an ambulance and enter it voluntarily to be transported to the hospital to see a doctor, or (2) be transported to a hospital by the Brooklyn Center Police Department in a police cruiser. (Tr. 31:2–19, 46:11–23; Gov't Ex. 8, at 1:06:00–1:06:36). Chapman replied that he had no health insurance, and SA Blackmore responded that the police would be a "free ride." (Gov't Ex. 8, at 1:06:36–1:06:46). SA Blackmore asked Chapman to think about it before he was forced to make a decision. (Gov't Ex. 8, at 1:07:00–1:07:04). Ultimately, the Brooklyn Center Police Department had an ambulance come to the residence and Chapman walked into it; and SA Blackmore asked Chapman to be honest with the doctor. (Tr. 31:25–32:18, 46:11–23; Gov't Ex. 8, at 1:26:10–1:27:10). One of the ambulance's medics asked SA Blackmore if Chapman was under arrest, with SA Blackmore responding that Chapman was not under arrest and that he was free to go if cleared by the doctor. (Tr. 32:16–33:1).

While SA Blackmore spoke to Chapman about his well-being, there were several other examples of the restriction of Chapman's movement. While waiting for the ambulance, Chapman asked to get his shoes and hat from his bedroom, with SA Blackmore responding that law enforcement would grab them for Chapman. (Gov't Ex. 8, at 1:13:38–1:19:20; Tr. 44:11–45:6). Chapman again reported he was standing up. (Gov't Ex. 8, at 1:17:00). When law enforcement photographed the basement area, Chapman was directed to the laundry room (with an escort) if he did not want to be in the photograph. (Tr. 44:11–45:6, 47:8–46:8; Gov't Ex. 8, at 1:22:32–1:26:10).

### B. Legal Standard

Chapman argues that he was in custody at the time of his questioning by SA Blackmore. Consequently, Chapman argues law enforcement was required to provide him a *Miranda* warning. By not providing a *Miranda* warning, Chapman asserts the statements he made to law enforcement must be suppressed.

### 1.    Standards for Custodial Interrogation

Under the Fifth Amendment, *Miranda* warnings are "required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). To determine whether a defendant was "in custody" for *Miranda* purposes, courts first "consider the 'totality of the circumstances' confronting the defendant at the time of the interview, and then . . . determine 'whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal

arrest.'" *United States v. Muhlenbruch*, 634 F.3d 987, 995–96 (8th Cir. 2011) (quoting *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007)); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The court focuses on "objective circumstances, not on subjective views of the participants." *Muhlenbruch*, 634 F.3d at 996 (quoting *Flores-Sandoval*, 474 F.3d at 1146).

Courts have used the following non-exhaustive factors to inform the custody inquiry:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The first three factors are "mitigating factors" that "tend to mitigate the existence of custody at the time of the questioning," while the last three factors are "coercive factors" that "tend to aggravate the existence of custody." *Id.* "A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002).

"There is no requirement . . . that the *Griffin* analysis be followed ritualistically in every *Miranda* case." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). But

"[w]hen the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Id.* "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828.

### 2.    Chapman was Not in Custody

The first *Griffin* factor, which is a mitigating factor, is present. SA Blackmore told Chapman that he was not under arrest, that answering questions was voluntary, that he could pick and choose which questions he answered, that he was free to leave, and that there was no plan to arrest Chapman that day. The Eighth Circuit has "long regarded these admonitions as weighty in the custody analysis" and has "never held that a person was in custody after receiving them." *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011); *Czichray*, 378 F.3d at 826 ("That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.") (internal citation omitted). After receiving these admonitions, Chapman spoke with SA Blackmore. Chapman demonstrated his immediate understanding of SA Blackmore's admonitions wherein, after answering some biographical questions, he refused to answer a question about

computer use in the residence. Chapman also refused to answer various other questions SA Blackmore asked. While Chapman did have to request to move around the basement, he made multiple requests throughout the interview: for a drink, to stand on multiple occasions, and for various items of clothing. Chapman never requested to leave or discontinue questioning.

The second *Griffin* factor is more difficult. Chapman did not have complete, unrestrained freedom of movement during his questioning. This is not a result of the questioning itself, however, but a by-product of the ongoing search warrant. SA Blackmore and SA Knez were not blocking Chapman's access to the stairway out of his basement, but law enforcement was conducting a search throughout the residence, including Chapman's bedroom near the stairway and were walking up and down the staircase. Moreover, Chapman was required by SA Blackmore to announce when he wished to stand up. Chapman was not permitted to walk to a nearby refrigerator to retrieve drinks or his bedroom to retrieve socks, shoes, or a hat; law enforcement grabbed them for Chapman. SA Blackmore testified that the restriction on Chapman's movement was a result of officer safety concerns. (Tr. 23:9–24:19). "Any warrant search is inherently police dominated; there is nothing untoward about that circumstance." *Perrin*, 659 F.3d at 721; *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014). Chapman stood on multiple occasions during his one and one-half hour encounter with law enforcement and he drank two sodas, but given the ongoing search warrant, law enforcement retrieved his socks, shoes, and hat and turned off his tablet alarm for him. Chapman's handcuffs were only placed for safety purposes and removed following the

security sweep, which Chapman understood. Chapman was not handcuffed during the interview. The execution of the search warrant, more than the interview itself, controlled Chapman's movement. The Court finds that while the second *Griffin* factor is partially present, the totality of the circumstances does not provide support that such partial existence of the second factor indicates Chapman was in custody or under arrest.

The third *Griffin* factor is present. While it is undisputed that law enforcement initiated contact with Chapman by executing the search warrant and asking Chapman if he would answer some questions, Chapman voluntarily acquiesced to the questioning. *See Czichray*, 378 F.3d at 829 ("Against a backdrop of repeated advice that he was free to terminate the interview, [defendant's] decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest. This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators."). Chapman demonstrated his understanding that the questioning was voluntary by refusing to answer certain questions of SA Blackmore. Indeed, Chapman refused to answer the first substantive question from SA Blackmore. After being told he was not under arrest and did not have to speak with law enforcement, Chapman spoke with SA Blackmore.

The fourth *Griffin* factor, the first of the coercive factors, is absent. The Court sees no strong-arm tactics or deceptive stratagems in the actions of law enforcement relating to the interview of Chapman. Chapman concedes as much. (ECF No. 47, at 7.) Law enforcement entered the residence and swept it for officer safety. The residence was

secured quickly, and Chapman's interview began immediately afterward. While law enforcement made a show of force in sending over a dozen officers and personnel into the home, only two of those officers were continuously present during Chapman's interview. While the other law enforcement officers can be heard in the background, there is nothing to suggest this impacted the interview. Chapman was seated on a sofa with SA Blackmore and SA Knez in separate chairs nearby. Chapman's access to the stairway was not blocked by SA Blackmore or SA Knez. SA Blackmore conducted the interview in a cordial manner and made no threats. Despite Chapman's repeated requests, SA Blackmore clearly explained that he could not make any promises or guarantees to Chapman in exchange for answers to questioning. While SA Blackmore did state he would report any cooperation to the prosecutor, this does not constitute a deceptive stratagem.

Chapman was provided drinks and socks, shoes, and a hat when requested. While Chapman was not permitted to turn off his tablet's alarm or fetch items from his bedroom, his bedroom and electronic devices were the main focuses of law enforcement's search. *Czichray*, 378 F.3d at 828 ("That a suspect is discouraged from using a telephone in his home during an interview often is not probative of whether he is free to terminate the interview altogether."). "Assuming a reasonable person in [Chapman's] position would feel that he was not free to use the [tablet] during the questioning, he still retained two viable options: conduct an uninterrupted interview with the agents or terminate the interview." *Id.* The act of law enforcement in "placing certain ground rules on an interview does not preclude a reasonable person from foregoing the

interview altogether." *Id.* SA Blackmore had adequate reasoning for preventing such interaction with the tablet as well as unfettered entry in the bedroom, and his refusal of Chapman's request does not amount to a strong-arm tactic.

The fifth *Griffin* factor is partially present because the atmosphere of the questioning was police dominated. More than one dozen members of law enforcement were either in the residence conducting a search warrant or performing some other related role, such as interviewing Chapman. Again, an ongoing search warrant execution is inherently police dominated, but there is nothing "untoward about that circumstance." *Perrin*, 659 F.3d at 721. Police dominance is somewhat diminished, however, because Chapman was near his own bedroom. As the Eighth Circuit has noted, "[a] reasonable person would have taken some comfort, however, in being in his own bedroom instead of an interrogation room at the police station." *Perrin*, 659 F.3d at 721; *Czichray*, 378 F.3d at 826 ("When a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'") (quoting *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984) and *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985)).

The sixth *Griffin* factor is not present. Chapman was told at the start of the interview that he was not under arrest. Chapman was not arrested at the conclusion of the interview. While SA Blackmore indicated Chapman could be brought to the hospital in the back of a squad car for a mental health assessment, Chapman was ultimately

transported by ambulance. The ambulance personnel were informed Chapman was not under arrest and free to go once the doctor cleared him.

In looking at the totality of the circumstances, and using the *Griffin* factors as guidance, the Court concludes Chapman was not in custody at the time of his interview. Chapman's own conduct shows he felt free enough to refuse to answer various questions, he felt comfortable asking for socks, shoes, a hat, and drinks, and he could stand provided he informed law enforcement. SA Blackmore clearly and repeatedly informed Chapman that he was not under arrest, that questioning was voluntary, and that he could make no promises in exchange for Chapman's responses. Thus, the Court finds a reasonable person in Chapman's position would not consider his freedom of movement restricted to the degree associated with formal arrest. *See United States v. Sutera*, 933 F.2d 641 (8th Cir. 1991) (finding no custody where law enforcement executed a search warrant, told defendant he was not under arrest and did not have to answer questions, and then interviewed defendant for one hour in his bedroom while the search was ongoing). Therefore, law enforcement was not required to provide Chapman with a *Miranda* warning. This Court recommends denying Chapman's motion to suppress.

## II.    SEARCH WARRANTS

### A.  Legal Standard

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The Fourth Amendment requires that search warrants be supported by probable cause." *United States v. Tripp*, 370 F. App'x 753, 757 (8th Cir. 2010)

(citation omitted). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation omitted); *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). "Probable cause requires only a showing of fair probability, not hard certainties." *Hudspeth*, 525 F.3d at 676 (citing *Gates*, 426 U.S. at 213).

> When the issuing court relies solely on an affidavit to establish probable cause, only the information found within the four corners of the affidavit may be considered. The affidavit must provide the issuing court with a substantial basis to support a finding of probable cause; wholly conclusory statements that the affiant has cause to suspect and does believe that illegal activity is occurring will not do. The affidavit for a search warrant should be examined using a common-sense, non-technical approach. Courts look to the totality of the circumstances to determine whether information provided by a confidential informant is reliable so as to support a finding of probable cause.

*Tripp*, 370 F. App'x at 757 (internal quotations and citations omitted); *United States v. Augustine*, 663 F.3d 367, 372 (8th Cir. 2011).

### B. Chapman's Motion

Chapman moves to suppress evidence obtained from two search warrants. The first warrant is dated August 2, 2018 and covers the Brooklyn Center residence, a truck, and an email address. (Gov't Ex. A (Case No. 18-mj-679-HB)). This is the warrant

discussed above that was executed on August 10 at Chapman's residence. The second warrant is dated September 28, 2018 and again covers the Brooklyn Center residence. (Gov't Ex. B (Case No. 18-mj-817-BRT)). Chapman offers no argument or facts in support of his motion, (ECF No. 34), only asking the Court to conduct a four-corners review of the warrants, (Tr. 5:5–6:1, 50:24–51:4). The Government likewise has relied upon its already-submitted response. (ECF No. 35, at 10).[3] Both submissions are devoid of any substantive discussion of either warrant. "A reviewing court should afford great deference to the probable cause determination of the issuing judge." *Tripp*, 370 F. App'x at 757 (citing *Hudspeth*, 525 F.3d at 674). This deference is even more applicable when neither party points to any defect in the warrants themselves, but instead ask for a blanket four-corners review.

### C.  The August 2, 2018 Search Warrant

SA Blackmore presented a search warrant application to United States Magistrate Judge Hildy Bowbeer on August 2, 2018, asserting the Brooklyn Center residence, a Chevrolet truck, and an email account had evidence of a crime; contraband, fruits of a crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime. SA Blackmore's affidavit detailed his investigation into

---

[3] The Government, citing an out-of-district and out-of-circuit case, asks that Chapman's motion be denied for lack of specificity. This Court will not do so. *See United States v. Love*, 189 F.R.D. 557 (D. Minn. 1999) (denying government's motion to strike defendant's motion to suppress for lack of specificity); *but see United States v. Ramsey*, Case No. 17-cr-124 (MJD/LIB), 2017 WL 4174525, at *8 (D. Minn. Aug. 10, 2017) (recommending denial of defendant's motion to suppress where defendant "failed to provide any evidence or argument to support the conclusory assertion in his motion papers that the DNA sample should be suppressed" and "failed to offer any sufficiently specific factual or legal grounds for suppression of the DNA sample"), *report and recommendation adopted by* 2017 WL 4174541, at *1 (D. Minn. Sept. 19, 2017); *United States v. Quiroz*, 57 F. Supp. 805, 822–23 (D. Minn. 1999).

internet activities occurring at the Brooklyn Center residence relating to child pornography. In particular, SA Blackmore detailed law enforcement's investigation following chatango's June 2017 report to the FBI concerning activities of its users as discussed above, ultimately leading law enforcement to suspect that Chapman was accessing and trading child pornography. (Gov't Ex. A, Blackmore Aff. ¶¶ 17–47). The affidavit includes numerous chatango chat transcripts from "kummer22" and law enforcement's linking of that username to Chapman. (Gov't Ex. A, Blackmore Aff. ¶¶ 17–47).

The totality of the circumstances show the August 2 warrant was supported by probable cause. SA Blackmore, through his affidavit, set forth sufficient facts to believe there was a fair probability that child pornography would be found in the Brooklyn Center residence. Given that the email address used to register for chatango referred to a Chevrolet truck, there was a fair probability that evidence of a crime could be found within that truck and in that email account. SA Blackmore's affidavit detailed an extensive investigation to trace back an online username to Chapman's home via IP addresses and other means, tying various statements of "kummer22" to records relating to Chapman. Law enforcement drew a link between "kummer22" and Chapman, thus linking Chapman to online activities involving child pornography. As such, this Court concludes the August 2 warrant was supported by probable cause. Therefore, this Court recommends denying Chapman's motion with respect to the August 2 warrant.

### D. The September 28, 2018 Search Warrant

SA Blackmore presented a search warrant application to United States Magistrate Judge Becky R. Thorson on September 28, 2018, asserting the Brooklyn Center residence had evidence of a crime; contraband, fruits of a crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime. SA Blackmore's affidavit detailed his investigation into internet activities occurring at the Brooklyn Center residence relating to child pornography. In particular, SA Blackmore detailed law enforcement's investigation following chatango's June 2017 report to the FBI concerning activities of its users as discussed above, ultimately leading law enforcement to suspect that Chapman was accessing and trading child pornography. (Gov't Ex. B, Blackmore Aff. ¶¶ 17–45). The affidavit includes numerous chatango chat transcripts from "kummer22" and law enforcement's linking of that username to Chapman. (Gov't Ex. B, Blackmore Aff. ¶¶ 17–45). The affidavit also details the results of the August 10, 2018 search of Chapman's residence and SA Blackmore's questioning of Chapman. (Gov't Ex. B, Blackmore Aff. ¶¶ 46–60). This included information that Chapman used a purportedly inactive chatango account to advise other chatango users that law enforcement had taken over his usernames. (Gov't Ex. B, Blackmore Aff. ¶¶ 48–55). Additionally, law enforcement located suspected child pornography on Chapman's tablet device. (Gov't Ex. B, Blackmore Aff. ¶¶ 56–59).

The totality of the circumstances show the September 28 warrant was supported by probable cause. SA Blackmore, through his affidavit, set forth sufficient facts to establish a fair probability that child pornography would be found in the Brooklyn Center

residence. SA Blackmore further detailed the results of the August 10 search where law enforcement located suspected child pornography and believed Chapman was warning other users of the chatrooms that his online usernames were compromised. Accordingly, this Court concludes the September 28 warrant was supported by probable cause. Therefore, this Court recommends denying Chapman's motion with respect to the September 28 warrant.

## III.    RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements, Admissions and Answers, (ECF No. 33), be **DENIED**.

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, (ECF No. 34), be **DENIED**.

[Signature on next page.]

Dated: February 14, 2019                              *s/ Steven E. Rau*

Steven E. Rau
United States Magistrate Judge
District of Minnesota

*United States v. Chapman*
Case No. 18-cr-250 (ECT/SER)


## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.